1  RONALD L. RICHMAN (SBN 139189)
   BULLIVANT HOUSER BAILEY PC
2  101 Montgomery Street, Suite 2600
   San Francisco, CA  94104-4146
3  Telephone:  415.352.2700
   Facsimile:  415.352.2701
4  E-mail:ron.richman@bullivant.com

5  LANCE D. REICH (*Pro Hac Vice Pending*)
   KOLESAR & LEATHAM
6  400 South Rampart Boulevard, Suite 400
   Las Vegas, NV  89145
7  Telephone:  702.362.7800
   Facsimile:  702.362.9472
8  Email: lreich@klnevada.com

9  Attorneys for Plaintiffs
   NEIMAN NIX and DNA SPORTS
10 PERFORMANCE LAB, INC.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| DNA SPORTS PERFORMANCE LAB, INC.; a Florida corporation, and NEIMAN NIX, an individual, | Case No.: |
|---|---|
| Plaintiffs, | **COMPLAINT - Lanham Act §43(a)(1)(B), 15 U.S.C. §1125(a)(1)(B); California Business and Professions Code §17500; California Business and Professions Code §17200** |
| vs. | |
| MAJOR LEAGUE BASEBALL; MAJOR LEAGUE BASEBALL ENTERPRISES, INC.; MLB ADVANCED MEDIA, L.P.; and MAJOR LEAGUE BASEBALL PLAYERS ASSOCIATION, | **JURY DEMAND** |
| Defendants. | |

COME NOW plaintiffs DNA Sports Performance Lab, Inc. ("DNA"), a Florida corporation, and Neiman Nix ("Nix"), an individual, and for their causes of action against defendants, allege as follows:

///

///

4835-0382-4817.1 37512/00001                – 1 –
                                  COMPLAINT; JURY DEMAND

## I. JURISDICTION AND VENUE

1. This is an action for (1) false and misleading representations in advertising in violation of section 43(a)(1)(B) of the Trademark Act of July 5, 1946, as amended (the "Lanham Act"), 15 U.S.C. §1125(a)(1)(B); (2) false advertising in violation of California Business and Professions Code §17500; and (3) unfair competition in violation of California Business and Professions Code §17200. This Court has jurisdiction over the subject matter of this action under 28 U.S.C. §1331 (federal-question jurisdiction), 15 U.S.C. §1121 (actions under the Lanham Act), and 28 U.S.C. §1367 (supplemental jurisdiction). This Court has supplemental jurisdiction under 28 U.S.C. §1367 over plaintiffs' state-law claims for violation of the California Business and Professions Code because they arise from the same facts as plaintiffs' Lanham Act claim.

## II. INTRA-DISTRICT ASSIGNMENT

2. Venue is proper in the Northern District of California because (a) more of defendants' teams and players reside in the State of California than any other state and at least one of the defendants' members resides in this District, (b) substantial parts of the events or omissions giving rise to the claims occurred in this District, and (c) the defendants regularly avail themselves of the courts of this district.

## III. PARTIES

3. Plaintiff Neiman Nix ("Nix") is an individual who presently resides in Texas.

4. Plaintiff DNA Sports Performance Lab, Inc. ("DNA") is a Florida corporation that provides diagnostic sports training and fitness testing services, and in addition, sells health supplements nationally, including in this District, made from certain substances extracted from the shed tissue of elk antlers, also known as "deer antler velvet." Plaintiff DNA also sells natural protein powders derived from bovine (cattle/cows). Plaintiff DNA maintains a website at https://dnahumanperformancelab.com/.

///

///

///

5. Plaintiffs are informed and believe, and on that basis allege, that defendant Major League Baseball (MLB) operates as a professional baseball organization in the United States and Canada. The MLB is represented by the Office of the Commissioner of Baseball, having an address at 1271 Avenue of the Americas, New York, York, NY 10020.

6. Defendant Major League Baseball Enterprises, Inc., is an affiliated company with MLB and resides in New York, NY.

7. Defendant MLB Advanced Media, L.P. is an affiliated partnership with MLB and resides in New York, NY.

8. Defendant MLBPA is an unincorporated association with its principal place of business in 12 East 49th Street, 24th Floor, New York, NY. MLBPA represents major league baseball players in collective bargaining with Major League Baseball ("MLB"); in negotiating and entering into group licensing agreements authorizing companies throughout the world to use the MLBPA represented athletes' identities, names, and likenesses in commercial products and services under specifically negotiated terms and conditions; and in many other matters affecting its members' economic and privacy interests. A substantial number of the players represented by MLBPA work and/or reside in California, which has more Major League Baseball teams than any other state.

### IV. BACKGROUND FACTS

9. Defendants have engaged in a pattern of unfair business practices targeting Nix and DNA, and deceived consumers about the nature of certain nutritional products sponsored and endorsed by defendants. After engaging in strong-arm business tactics against Nix and DNA and making harmful statements to the press accusing plaintiffs of using and selling purportedly banned substances, defendants are themselves unfairly profiting from the sale of products containing those same substances. Defendants' conduct constitutes unfair and deceptive trade practices and false advertising by allowing MLB and MLB players to endorse products containing insulin-like growth factor (IGF-1) that are prohibited by MLB's own standards.

10. Defendants vilified Nix and DNA in public for using natural animal-based IGF-1 in DNA's product derived from elk antlers. However, MLB and its players endorse a number of food and human performance products that contain IGF-1. The MLB logo and, *inter alia*, individual player likenesses, are prominently displayed on product packaging and in marketing materials. This endorsement creates an impression that these products are used by professional baseball players when, according to MLB's standards, IGF-1 is not permissible and thus players using these products could be found in violation of MLB standards. MLB and the MLBPA should follow their own standards and not be allowed to endorse products that contain IGF-1 and hold them out to the public as products used by professional baseball players.

11. Plaintiff Nix is a former professional baseball player selected straight out of high school in the 1998 Major League Draft by the Cincinnati Reds and later signed by the Milwaukee Brewers. Unfortunately, Nix's career as a professional player was cut short by arm injuries, the widespread occupational hazard which had always plagued pitchers.

12. Following Nix's departure from professional baseball, he pursued various employment and business opportunities connected with the sport he loved and to which he had devoted his life. First, he coached college baseball. His experience there led him to the realization that the standard training program used by colleges and universities needed to be updated and improved by an individualized and scientific methodology aimed at maximizing the potential of each player relative to particular skills and team positions. Over the next few years, Nix developed a better system of training based on his growing knowledge and experience in the fields of sports medicine and biomechanics.

13. Drawing inspiration from years of detailed training, study, trial, and error in development of new pitching techniques, Nix conceived a new form of pitching. Nix then incorporated his new pitching method into a complete system of biometric analysis, data collection, individualized training, and physical therapy which he developed in the expectation of teaching those aspiring to pitch professionally how to maximize their athletic performance while at the same time avoiding undue injury, rehabilitating injuries, and prolonging their active careers. Nix made use of various pieces of sophisticated equipment and computer programs as

part of his diagnostic and training program, including a motion image tracking device showing baseball and fitness related movement in a computer generated, 3-D rotational animation and integrated with scientific data for purposes of his program.

14. In 2006, Nix went into business for himself by opening a year-round training and development center for athletes aspiring to college or professional baseball careers. His American Baseball Institute, which was first located in Seattle, Washington, provided his students with housing, individualized training and testing, intensive daily practice, and the opportunity for regular exposure to MLB and college scouts through open try-outs and exhibition games with minor league teams. Nix hired many former professional players and coaches to work as the camp's staff. The success of Nix's business outgrew its venue twice until it finally took over the former Philadelphia Phillies spring training stadium in Clearwater, Florida. Scouts from MLB teams were deeply impressed with Nix's program. Their regular visits to his facility resulted in the signing of professional contracts for hundreds of his student prospects and contributed significantly to the growth of the baseball industry[1].

15. The growth and financial potential of Nix's baseball training academy were damaged by the malicious investigatory methods that MLB employed in its heavy-handed and unfounded inquiry into allegations of improprieties in the operation of Nix's business. As a result, the American Baseball Institute was greatly damaged.

16. Nix launched a new business in the form of a state-of-the-art sports science center in Miami Beach, Florida in April of 2012. Named "DNA Sports Performance Lab, Inc.," DNA provided diagnostic sports training and fitness testing services in addition to selling health supplements made from certain substances extracted from the shed tissue of elk antlers, also known as "deer antler velvet." There were two, complimentary sides to DNA's sports science business. On the one hand, DNA offered the use of sophisticated equipment and techniques to scientifically analyze each client's particular physical and physiological profile to determine

---

[1] Plaintiff Nix also has a pending lawsuit alleging that MLB teams misappropriated his intellectual property, venued in Palm Beach County, Florida, involving the St. Louis Cardinals, Houston Astros, and recently suspended Houston Astros President Leff Luhnow, in *Nix v. Luhnow,* 50-2018-002611-CA-01.

1 what regimen of exercise, training, nutrition, and natural supplements to recommend, and then
2 worked closely with that client to implement that program.  The other part of DNA's business
3 was the sale of health supplements manufactured to the highest clinical standards and commonly
4 referred to as "bio-identical compounds" or "nutraceuticals."  Plaintiff DNA also sells
5 supplements made from bovine, such as protein powder.

6      17.     DNA sells one such prominent form which is derived from the
7 humanely-harvested antler tissue naturally shed by elk, one of the largest species in the deer
8 family, as part of their annual, antler molting and regeneration process.  This substance has been
9 used in Chinese medicine for centuries as a cure and treatment for various chronic diseases as
10 well as a tonic and energizer.  Deemed safe and effective, and available without a doctor's
11 prescription, the antler extract is formulated into natural, non-steroid supplements which can
12 legitimately be claimed to regenerate growth at a cellular level, increase physical strength,
13 enhance athletic performance, increase energy levels, retard the aging process, sharpen memory
14 and concentration, rejuvenate the libido, and provide many other health benefits.

15      18.     The line of products derived from antler tissue and sold by DNA has never been
16 prohibited by the Worldwide Anti-Doping Agency ("WADA"), an international independent
17 agency founded in 1999 to combat the use of performance enhancing substances in sports.  The
18 WADA lab in Montreal also conducts MLB drug tests and develops testing protocols for MLB
19 and MLBPA as part of the CBA Joint Drug Agreement.  Neither Nix nor DNA has ever sold or
20 even recommended the use of anabolic steroids, commonly known as performance enhancing
21 drugs ("PEDS").  The formulas they developed were designed as natural and safe alternatives to
22 PEDS.  The sports world has had a well-publicized problem with PEDS for many years now.
23 DNA's business philosophy was in the opposite direction, advocating against the use of such
24 illegal substances.  The mission of DNA, as its name implies, is to maximize an athlete's innate
25 physical potential through the application of medically and scientifically sound and safe
26 principles and methods.  The active ingredient in the supplements developed and sold by Nix
27 and DNA is a naturally occurring, bio-identical form of IGF-1 which is found in foods such as
28 milk, meat, fish, whey protein, and in the human body.  Nix never tried to sell or market these

1  natural performance supplements to any MLB players on account of a non-competition
2  agreement with the purchasers of his former interest in American Baseball Institute.

3      19.    Nevertheless, Nix was the target of a second, investigation of MLB in the first
4  half of 2013 falsely accusing him of selling illegal performance enhancing drugs to MLB
5  players.  MLB's focus on Nix and DNA was part of its larger crusade to rid the sport of the
6  perceived widespread use of such drugs.  Prompted by the scandal created by the association of
7  several prominent MLB players, including Alex Rodriguez, with South Florida's "Biogenesis
8  Clinic," MLB investigated into every anti-aging clinic in the state in order to try to polish its
9  own image and included DNA in its sights.

10      20.    Again resorting to strong-arm tactics that created the impression of guilt in the
11  minds of those it contacted, MLB's investigators posed as FBI and DEA officials and questioned
12  Nix's clients and colleagues.  Not one shred of evidence was ever uncovered proving that Nix or
13  DNA sold any illegal substance to any MLB player or that any MLB player ever tested positive
14  for any product sold by NIX. But the bullying tactics used by MLB's agents in trying to elicit
15  the damning evidence had the effecting of planting enough doubt to cause great harm.  Nix's
16  business reputation was again dragged through the mud without any credible basis and Nix
17  again suffered an economic blow to a growing business with great promise on account of MLB's
18  malicious campaign of blame against an honest and dedicated entrepreneur[2].

19      21.    Furthermore, in July 2016 Nix had a lengthy phone conversation with MLBPA's
20  in house attorney, who oversees the drug policy, Bob Lenaghan.  Mr. Lenaghan informed Nix
21  that deer antler was not and has never been banned in baseball and that no animal products are
22  banned.  Mr. Lenaghan even sent out a memo telling players to be aware of a tainted supplement
23  called methyltestosterone found in deer antler supplement products, but the memo never
24  mentioned anything about deer antler or natural IGF-1 being banned, which it clearly would
25  have stated. See **Exhibit 1** attached hereto.

---

[2] There is an ongoing litigation in Miami Dade County, Florida, *Nix v. The Office of the Commissioner of Baseball, et. al.,* 2019-002611-CA-01.

4835-0382-4817.1 37512/00001      – 7 –
COMPLAINT; JURY DEMAND

22. Nix and DNA filed suit for tortious interference in July of 2016 in federal court, Southern District of New York, Case Number 1: 16-cv-05604 to redress the devastating economic harm and personal offenses they suffered at their hands of MLB in the course of the two groundless investigations into alleged wrongdoing. Although, that suit was ultimately unsuccessful, the pattern of unfair contact by Defendants that gave rise to its filing continued.

23. In response to the tortious interference suit, MLB issued a press release that said, *inter alia*: "Other than noting that in Paragraph 40 of the Complaint Mr. Nix admits to selling products purportedly containing at least one banned performance-enhancing substance (IGF-1), MLB has no further comment on this frivolous lawsuit." In addition, Defendant MLB stated to the Associated Press that: "all natural, synthetic and bioidentical versions of any prohibited substances— including, but not limited to, IGF-1— are considered banned."

24. By publicly stating that Nix admitted to selling at least one banned substance, MLB is essentially banning Nix from ever working again in any MLB or MLBPA related capacity because MLB has seven Anti-Doping policies where anyone selling a banned substance is subject to severe punishment per the Collective Bargaining Agreement and other MLB-related agreements.

25. As a result of the statement by MLB to the press, and statements by ESPN, the AP, and USA Today, Nix and DNA filed a defamation lawsuit that was removed to the Southern District of Florida, Case No. 18-cv-22208, and which was ultimately resolved by the Eleventh Circuit Court of Appeals. Although the Eleventh Circuit affirmed judgment for the Defendants in that suit, it also expressly held that the statements Nix and DNA believed to be defamatory were true. Importantly, the Eleventh Circuit has clarified that the MLB regulations consider IGF-1, in all forms, a banned substance.

26. IGF-1 is a naturally occurring constituent in all mammals, as described in an article from 2011 quoting experts from the World Anti-Doping Agency (WADA) and the National Science Foundation (NSF). http://www.thepostgame.com/features/201108/deer-antler-supplements-might-be-kryptonite-pro-sports-drug-policies. See **Exhibit 2** attached hereto.

27. It also well known that whey protein and other proteins derived from meat or milk contain IGF-1.

28. Further, also attached to this Complaint as **Exhibit 3** are excerpts from the deposition of WADA science director Dr. Oliver Rabin's in the case of *Vijay Singh v. PGA Tour, Inc*., in New York state court. In that deposition, Dr. Rabin expressly states that natural IGF-1 is found in deer antlers and colostrum (milk).

29. On or about September 11, 2018 MLBPA's attorney, based in San Francisco, Michael Rubin sent Nix's attorney an email stating: "the Joint Drug Prevention and Treatment Program expressly lists IGF-1 as a banned Performance Enhancing Substance and does not distinguish between natural and other sources of IGF-1 in that listing. No determination has been made in any proceeding to limit the scope or meaning of that listing."

30. Furthermore, recent news reports show that as a result of concerns about over-the-counter sexual enhancement pills, the MLB issued a memo warning about the risk of non-NSF-certified supplements and that players would be subject to discipline even if they inadvertently ingested a banned substance.

31. Many MLB players and coaches consume deer antler products, or other product with IGF-1, none of whom have ever been disciplined at all. MLB's selective enforcement has targeted individual companies, while MLB at the same time has profited from sales of products that contain IGF-1.

32. While Plaintiffs question the wisdom of MLB's unreasonably overbroad standards as to IGF-1 as written, the Eleventh Circuit Court of Appeals has made clear that -- as a matter of law-- IGF-1 in any concentration is a banned substance under the Joint Drug Prevention and Treatment Program (the "Program") between the Office of the Commissioner of Baseball and the Major League Baseball Players Association. The Program specifically lists as a "Prohibited Substance" and as a "Performance Enhancing Substance" at 2.B.68: "Insulin-like Growth Factor (IGF-1), including all isomers of IGF-1 sometimes referred to as Mechano Growth Factors."

1  33.   On May 15, 2019, the Eleventh Circuit *Neiman Nix, DNA and Sports Performance Lab, Inc. v. ESPN, INC., The Associated Press, Inc., and USA Today*, Case No. 18-14107, May 15, 2019 (not published), specifically stated that:

> "The MLB Prohibited Substances List includes 'Insulin-like Growth Factor (IGF-1), including all isomers of IGF-1 sometimes referred to as Mechano Growth Factors.' The List does not describe the source of the substance or distinguish between synthetic and natural IGF-1. Therefore, the omission of any distinction between synthetic and natural IGF-1 does not render the statements untrue or defamatory."

34.   Because the Eleventh Circuit decision is now final, it is clear that the prohibited substance in the Program at 2.B.68 is Insulin-like Growth Factor (IGF-1), including all isomers of IGF-1 regardless of the source of the substance or if it is synthetic or natural IGF-1, as a matter of law.

35.   MLB made its statement in its press release regarding the admitted sales of natural IGF-1 to the detriment of DNA.  Yet, MLB has sponsors and partners that sell products containing IGF-1 and compete with the products of DNA.  The following products exemplify MLB endorsement of products that are banned from MLB baseball.

36.   Gatorade, a sponsor of MLB, makes and sells "RECOVER" whey protein bars. RECOVER bars include the MLB logo on their wrappers and boxes.  The Gatorade packaging states it is "The Protein Bar Provider" for MLB, NFL, NBA and NHL.  See https://www.gatorade.com/products/bars-and-chews/whey-protein-bar-chocolate-chip-20g-protein-12-pack.



37. Cytosport, Inc., is the manufacturer of MUSCLE MILK brand protein products, and is a partner of MLB. Muscle Milk contains Calcium Caseinate (Milk), Milk Protein Isolate, and Sodium Caseinate (Milk). Cytosport has previously released bottles featuring the Chicago Cubs, Chicago White Sox, Los Angeles Dodgers and Texas Rangers.



Cytosport states that its products are "certified safe for sport" under the guidelines of the National Science Foundation (NSF). Being "certified safe for sport" is an express representation that this product contains no banned substances under the MLB Joint-Program.

38. Major League Baseball Players Association (MLBPA) has entered into its partnership with a nutritional supplement company, Klean Athlete, to sell protein supplements containing whey protein isolates to the general public. See **Exhibit 4** attached hereto.

https://www.kleanathlete.com/media/wysiwyg/klean/press/KLEAN-ATHLETE-BCAA.fnl.pdf



Klean Athlete states that its products are "certified safe for sport" under the guidelines of the NSF. Being "certified safe for sport" is an express representation that this product contains no banned substances under the MLB Joint-Program.

///

///

39. Eyepromise is a partner of MLB. Eyepromise makes nutritional supplements containing natural proteins.

Eyepromise states that its products are "certified safe for sport" under the guidelines of the NSF. Being "certified safe for sport" is an express representation that this product contains no banned substances under the MLB Joint-Program.

40. In view of the finality decision of the Eleventh Circuit that the Program of the MLB does ban all products containing IGF-1, including all isomers of IGF-1, whether natural or synthetic, the above products also contain banned performance-enhancing substances, *e.g.*, IGF-1, as a matter of fact and law.

41. MLB made its press release in 2016 to the clear detriment of the sales and reputation of DNA with respect to DNA selling products that contain IGF-1. Yet, MLB has not made any such statements regarding the sales by its sponsors and partners that sell products containing natural IGF-1, even with those products bearing the logos and trademarks of MLB. MLB has actually benefitted from its sponsorships and partnerships with competitors of DNA whom MLB allow to sell banned products containing IGF-1 with endorsement from MLB. Consequently, since July 14, 2016, the MLB has been engaging in unfair competition against DNA by intentionally harming the sales of DNA of nutritional supplements while benefitting from the sales of competing products by MLB's sponsors and partners. Such conduct constitutes unfair competition, deceptive trade practices, and violates other several federal and state laws.

///

42. The use of MLB Logos and other indications of sponsorship create an impression in the minds of consumers that the products are used by professional baseball players. At a minimum, Defendants' sponsorship suggests that these products would not constitute banned substances under the MLB's Program.

43. Moreover, the MLB is sanctioning the sale of products to athletes and the general public that contain prohibited performance-enhancing substances that can get those consumers banned from professional baseball.

44. Specifically, the individual teams of MLB are aware of and encourage the use of the nutritional supplements by their players that contain IGF-1. The teams do this with the knowledge and consent of MLB and MLBPA.

45. Upon information and belief, the MLB teams, MLB, and MLBPA do not inform the players of any potential adverse interaction between IGF-1-containing products and other drugs and substances.

## V. FIRST CAUSE OF ACTION

**(Lanham Act §43(a)(1)(B), 15 U.S.C. §1125(a)(1)(B))**

46. Plaintiffs reallege and incorporate by reference, as though fully set forth, the allegations in paragraphs 1-45 of this complaint.

47. By their acts set forth above, including both affirmative statements and omissions, Defendants have used and continue to use false and misleading descriptions or representations of fact, in the context of commercial advertising or promotion, that are directed to the nature, characteristics, or qualities of Plaintiffs' services or commercial activities and Defendants' own services or commercial activities, in violation of section 43(a)(1)(B) of the Lanham Act, 15 U.S.C. §1125(a)(1)(B). The use of MLB logos on food and sports performance enhancement products suggests that MLB players use the products, or, at a minimum, that the products are permissible for use by MLB players. In fact, these products contain IGF-1, which the MLB's Program define as banned substances. Defendants' false and misleading statements are related to material elements of purchasers' decisions and are likely to influence such decisions.

48. Defendants' false and misleading statements actually deceived or are likely to deceive a substantial segment of the relevant market for clients or purchasers of nutrition and sports performance products who would reasonably believe that the endorsed products are used by MLB players, or at a minimum, that use of the products would not potentially result in a player being disqualified or banned from the MLB as a result of using a banned substance.

49. Defendant's false and misleading explicit and/or implicit representations go to the inherent quality or characteristic of their endorsed products.

50. Defendants' false and misleading statements have entered "commerce," as that term is defined in section 45 of the Lanham Act, 15 U.S.C. §1127. MLB sponsored products containing IGF-1 are found on sale in multiple states and online.

51. Defendant knows or has reason to know that third parties would have, and in fact have relied upon, its endorsement/approval of the aforementioned products to mean the product does not contain any banned substances. This constitutes false and misleading misrepresentations regarding those products as the endorsed products do contain a banned substance, IGF-1.

52. Plaintiffs were injured and will continue to be injured as a result of Defendants' false and misleading statements, both by direct diversion and loss of sales and profits, and by a lessening of the goodwill associated with Plaintiffs' name, business, and services. Defendants' endorsement of competitors has driven market share away from Nix and DNA.

53. The injury to Plaintiffs' business and goodwill from Defendants' false and misleading statements is irreparable because the full extent of such injury, which would extend far into the future, cannot be precisely measured and compensated for.

54. Defendants continue to do the acts complained of in this complaint, and, unless restrained and enjoined, Defendants will continue to do so, all to Plaintiffs' irreparable injury. Plaintiffs' remedy at law is not adequate to compensate it for the future injuries received and threatened.

///

///

55. Defendants' conduct has been willful, wanton and committed with the intent to deceive purchasers of food or nutrition products that the products are not banned substances, making this an exceptional case entitling Plaintiffs to recover additional damages and attorneys' fees pursuant to 15 U.S.C. §1117.

56. Defendants' conduct has caused Plaintiffs to lose significant revenue and damages in excess of $1,000,000 and will continue to accrue. Plaintiffs further request that the Court award plaintiffs their attorneys' fees and costs incurred in the bringing of this action.

## VI. SECOND CAUSE OF ACTION

**(California Business and Professions Code §17500)**

57. Plaintiffs reallege and incorporate by reference, as though fully set forth, the allegations contained in paragraphs 1 – 56 of this Complaint.

58. Defendants have made statements in advertising that are untrue or misleading, specifically that their endorsed products do not contain banned substances.

59. Defendants knew, or by the exercise of reasonable care should have known, that their statements were untrue or misleading.

60. Members of the public are likely to be deceived by Defendants' untrue or misleading statements as a reasonable person will infer that an endorsement by Defendants' means that the product does not contain any banned substances.

61. Defendants conduct constitutes false advertising in violation of section 17500 of the California Business and Professions Code.

62. Defendants' misconduct will continue or reoccur unless it is restrained and enjoined.

## VII. THIRD CAUSE OF ACTION

**(California Business and Professions Code §17200)**

63. Plaintiffs reallege and incorporate by reference, as though fully set forth, the allegations contained in paragraphs 1 – 62 of this complaint.

64. Defendants' conduct is unlawful, unfair, and fraudulent and therefore in violation of section 17200 of the California Business and Professions Code (also known as the Unfair

Competition Law).  Defendants' conduct was unlawful in that it was in violation of (a) section 43(a)(1)(B) of the Lanham Act, 15 U.S.C. § 1125(a)(1)(B); and (b) section 17500 of the California Business and Professions Code.

65.  Defendants' conduct was unfair because it tends to significantly harm competition and is anticompetitive in nature.  By endorsing the above-mentioned products that contain IGF-1, but publicly announcing that all forms of IGF-1 are banned, Plaintiffs have been effectively ostracized from the market, yet Defendants' endorsed products remain on the market.

66.  Defendants' conduct was fraudulent, as that term is understood under the California Unfair Competition Law, because a significant number of reasonable consumers of MLB-endorsed products containing IGF-1 are likely to be misled by Defendants' false statements and nondisclosures to believe that the products are used by professional baseball players or that the products do not contain a banned substance.  Defendants knew, or by the exercise of reasonable care should have known, that their statements were false or misleading.

WHEREFORE, Plaintiffs pray for relief against Defendants as follows:

## VIII.  RELIEF REQUESTED

1.  On the First Cause of Action:  (a) for the issuance of temporary, preliminary, and permanent injunctive relief restraining Defendants, their officers, employees, agents, affiliates, parents, and subsidiaries, and all other persons who act in concert with them from making false, misleading, or deceptive statements or representations about Plaintiffs; (b) damages in an amount to be proved at trial under 15 U.S.C. §1117, based on, among other things, lost business revenues from prospective clients who selected other products based on MLB or MLB player endorsements; (c) an accounting to determine the profits Defendants have made in connection with their sales of goods provided to customers who were diverted from Plaintiffs' goods by Defendants' false and misleading statements, and an award to Plaintiffs of such profits and trebling of such award under 15 U.S.C. §1117(a); (d) an award to Plaintiffs of their costs and attorneys' fees incurred in this action under 15 U.S.C. §1117(a) on the ground that this is an exceptional case; (e) and such other relief as the Court may deem just and equitable.

2. On the Second Cause of Action, (a) for the issuance of temporary, preliminary, and permanent injunctive relief restraining Defendants, their officers, employees, agents, affiliates, parents, and subsidiaries, and all other persons who act in concert with them from making false, misleading, or deceptive statements or representations about Plaintiffs; (b) an accounting to determine the profits Defendants have made in connection with their sales of goods provided to customers who were diverted from Plaintiffs' goods by Defendants' false and misleading statements, (c) for restitution of all sums unlawfully collected by defendants; (d) an award to Plaintiffs of their costs and attorneys' fees incurred in this action; and (e) and such other relief as the Court may deem just and equitable.

3. On the Third Cause of Action, (a) for the issuance of temporary, preliminary, and permanent injunctive relief restraining Defendants, their officers, employees, agents, affiliates, parents, and subsidiaries, and all other persons who act in concert with them from making false, misleading, or deceptive statements or representations about Plaintiffs; (b) an accounting to determine the profits Defendants have made in connection with their sales of goods provided to customers who were diverted from Plaintiffs' goods by Defendants' false and misleading statements, (c) for restitution of all sums unlawfully collected by defendants; (d) punitive damages under California Civil Code §3294; (e) an award to Plaintiffs of their costs and attorneys' fees incurred in this action; and (f) and such other relief as the Court may deem just and equitable.

**JURY DEMAND**

Pursuant to Federal Rule of Civil Procedure 38(b)(1), Plaintiff demands a trial by jury.

DATED: January 14, 2020

          BULLIVANT HOUSER BAILEY PC


By   /s/ Ronald L. Richman
      RONALD L. RICHMAN

Attorneys for Plaintiffs
NEIMAN NIX and DNA SPORTS PERFORMANCE LAB, INC.